UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 13 |
| KATHLEEN M. DEETER | ) ) | Case No. 23-40106-CJP |
| Debtor | ) ) ) |  |

**ORDER**

Before the Court are (i) the *Motion to Dismiss Chapter 13 Case for Lack of Good Faith in the Filing of the Case* [ECF No. 26] (the "Dismissal Motion") filed by Bernard Gauthier ("Gauthier") seeking to dismiss the Chapter 13 case filed by Kathleen M. Deeter ("Deeter" or the "Debtor") for "cause" as having been filed in bad faith under 11 U.S.C. § 1307(c)[1] and the Debtor's objection to the Dismissal Motion [ECF No. 44]; and (ii) the Objection of the chapter 13 trustee, David A. Mawhinney (the "Trustee"), to Debtor's Homestead Exemption [ECF No. 72] (the "Homestead Objection"), which Gauthier has joined and remains the only active objecting party as the Trustee entered into a stipulation with the Debtor [ECF No. 172] (the "Stipulation"), approval of which remains pending. This Order constitutes the Court's findings of fact and conclusions of law contemplated by Fed. R. Bankr. P. 7052, as made applicable to these matters pursuant to Fed. R. Bankr. P. 9014(c).[2] In reaching my determination, I considered

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").

[2] My findings of fact are incorporated in the discussion. Any findings of fact that are, in whole or part, rulings of law shall be considered as such and vice versa. While I may cite to specific supporting evidence in the record, my findings are often supported by additional evidence in the record that I have considered, and I do not intend to limit support for my findings to the cited portion of the record. Further, to the extent that I reference testimony or other evidence that supports my rulings, I have credited that testimony or other evidence even if I have not made an express finding.

1

the demeanor and credibility of each of the witnesses who testified over the course of the one and a half days of trial, all exhibits which were admitted into evidence, and the oral arguments of counsel to the Debtor and Gauthier. I also considered the undisputed facts and stipulations in the joint pretrial statement [ECF No. 199] and the entire record in this case. For the reasons set forth below, I deny the Dismissal Motion, while reserving a final assessment to determine the Debtor's good faith in connection with confirmation of a chapter 13 plan, and overrule the Homestead Objection.

**I. Motion to Dismiss**

On request of a party in interest, the Court may convert to chapter 7 or dismiss a case, whichever is in the best interests of creditors and the estate, "for cause." 11 U.S.C. § 1307(c). "The moving party under § 1307(c) bears the burden of proof." *Stevenson v. TND Homes I, LP (In re Stevenson)*, 583 B.R. 573, 579 (B.A.P. 1st Cir. 2018). Section 1307(c) sets forth a non-exhaustive list of examples of what constitutes "cause" for dismissal and "[d]ismissal under § 1307(c) is committed to the bankruptcy court's discretion." *Id*.

"Although lack of good faith is not specifically enumerated as 'cause,' it is well established that lack of good faith (or bad faith) is 'cause' for dismissal . . . of a Chapter 13 case under § 1307(c)." *Sullivan v. Solimini (In re Sullivan)*, 326 B.R. 204, 211 (B.A.P. 1st Cir. 2005). The United States Bankruptcy Appellate Panel for the First Circuit (the "BAP") has adopted a totality of the circumstances test to determine a debtor's good faith, which is imposed on a Chapter 13 debtor at two stages of the case. *See id*.; *Cf. Berliner v. Pappalardo (In re Puffer)*, 674 F.3d 78, 82 (1st Cir. 2012) (adopting analogous application of totality of circumstances test; expanding application of totality of circumstances test for measuring "good faith" in the context of § 706(a) conversion to chapter 13 to the context of adjudicating good faith in the plan

confirmation context under § 1325). "First, a debtor must file the Chapter 13 petition in good faith. Second, the debtor must file the Chapter 13 plan in good faith. The only distinction is that, under § 1307(c), the objecting creditor has the burden of proof, while under § 1325(a)(3), the debtor has the burden. Both inquiries advance one of the primary purposes of bankruptcy, which is to relieve the honest but unfortunate debtor from the weight of oppressive indebtedness, allowing the debtor to start afresh. If a creditor is successful in proving that the debtor filed the petition in bad faith, the court may dismiss the petition for cause." *In re Sullivan,* 326 B.R. at 211–12 (internal citations omitted).

"Good faith" is not defined in the Bankruptcy Code, so courts are left to engage in a fact-intensive analysis on a case-by-case basis. *See id.* at 212 (citation omitted) ("Whether this balancing of equities is called moralistic, judging, or evaluating, it is exactly what the courts have been left with under the ambiguous requirement of good faith."). "A key inquiry, however, is whether the debtor is seeking to abuse the bankruptcy process." *In re Mattick*, 496 B.R. 792, 800 (Bankr. W.D.N.C. 2013) (internal quotation omitted). As stated by the BAP in *In re Sullivan*:

> In applying the totality of the circumstances test to determine whether a Chapter 13 petition has been filed in bad faith, bankruptcy courts generally consider the following factors: (1) debtor's accuracy in stating her debts and expenses, (2) debtor's honesty in the bankruptcy process, including whether she has attempted to mislead the court and whether she has made any misrepresentations, (3) whether the Bankruptcy Code is being unfairly manipulated, (4) the type of debt sought to be discharged, (5) whether the debt would be dischargeable in a Chapter 7, and (6) debtor's motivation and sincerity in seeking Chapter 13 relief. A finding of bad faith does not require fraudulent intent by the debtor. Neither malice nor actual fraud is required to find a lack of good faith. The bankruptcy judge is not required to have evidence of debtor ill will directed at creditors, or that debtor was affirmatively attempting to violate the law—malfeasance is not a prerequisite to bad faith.

326 B.R. at 211–12 (citations and quotations omitted).

3

This case presents a somewhat difficult assessment of the Debtor's good faith in filing her petition and related actions. Gauthier adduced evidence from which I infer that: (i) the specific performance litigation Gauthier commenced relating to the Debtor's property located at 60 Grafton Street, Millbury, MA (the "Property") was one of the significant reasons for the Debtor filing bankruptcy; (ii) the Debtor failed to list two significant creditors in her initial schedules (Joanne Klauer, a friend in whose apartment she resided for an extended period of time, and Attorney Howard J. Potash, her former legal counsel); (iii) the claim of Klauer was not being pressed for collection and was undocumented; (iv) the Debtor did not initially schedule fraud claims against Gauthier and "malpractice claims" against a realtor and an attorney associated with the Gauthier transaction; (v) the Debtor amended her schedules to increase the fair market value of the Property from $192,000 to $448,000; (vi) the Debtor consistently disclosed $1,200 as her monthly electrical expense, when that amount was a balance that did not reflect what would be an average over a period of time[3]; and (vii) the terms and circumstances of the renovations performed by Electrical Construction & Contracting, Inc. ("EC&C") and the mortgage granted to secure payment for those services were unusual. Gauthier also cites numerous cases where courts have determined that a Debtor filed a case in bad faith where the only object was to avoid specific performance of a purchase and sale agreement.

The challenge for me in this case has been to weigh that evidence against evidence presented by the Debtor intended to rebut Gauthier's assertions and demonstrate her good faith. I found the Debtor generally credible. The Debtor testified she was unable to afford to make repairs to the heating system at the Property or address the resulting damage from burst pipes requiring her to move to her friend Klauer's apartment. She returned to the house in which she

---

[3] On the eve of trial, the Debtor sought to amend her Schedule J to reflect a reduced monthly expenses for electric, heat, and natural gas utilities of $528 from $1,200.

4

was raised and lived during her adult life located at the Property regularly to care for animals and check on the Property and stayed at the house during certain warmer months. The Debtor admitted to struggling with alcohol, which appears to have affected her ability to deal with her significant financial challenges, including issues related to maintenance of the Property and that her mortgage was in default. She listed the Property for sale in 2019. What happened after that is less clear. The Debtor claims that her initial realtor decreased the initial asking price implying that he did that without her authority. Kathy Dwyer ("Dwyer or the "Realtor"), a second realtor representing both Gauthier and the Debtor as a "dual agent," testified that the initial realtor appeared to be marketing the Property after his listing agreement had expired.

The Debtor's transaction with Gauthier was facilitated by Dwyer who located the Property for Gauthier and acted as agent for the Debtor and Gauthier. The Debtor signed a "contract for sale" and dual agency agreement in the presence of the Realtor in the Realtor's vehicle. Exs. 1 and 2. The Debtor also left a voicemail confirming that the Realtor could sign her name to a purchase and sale agreement, which the realtor testified she believed authorized her to sign other documents on behalf of the Debtor. Ex. 7. The voicemail referenced one document and not all future documents. The Debtor testified that she was depressed and drinking heavily and was generally "not in a good state at the time," but does not recall mentioning that to the Realtor.

Gauthier and the Debtor signed a purchase and sale agreement on or about January 24, 2020. The purchase and sale agreement provided that the Debtor would sell the Property to Gauthier for $130,000, less a $27,337.97 "reinstatement" payment to be made by Gauthier to cure the arrears on the Debtor's mortgage. Ex. 21. After the agreement was signed, on or about January 27, 2020, the Town of Millbury issued a public hearing notice regarding a proposed

5

zoning change regarding the Property from mixed-use residential to industrial. Ex. 8. The Debtor acknowledged that "[t]his set into motion the process of altering the permissible use of the Debtor's property drastically impacting the potential value of the land. The Purchase and Sale Agreement was amended to reflect the changes. However, the purchasing price remained the same at $130,000.00." Debtor's Obj. to Dismissal Mot. [ECF No. 44], ¶ 8.

The Debtor is alleged to have signed addenda that had the effect of extending closing of the sale and financing contingency approximately two years during which time Gauthier was to pay the Debtor's mortgage payments and real estate taxes. Exs. 23 and 24. The Realtor signed the addenda electronically on behalf of the Debtor. The Debtor disputes that she authorized the Realtor to sign on her behalf. There was evidence presented that Gauthier's counsel requested a wet signature with respect to the second addendum. At trial, Gauthier presented what was alleged to be a "wet signature" on the second addendum. Ex. 25. Gauthier's daughter credibly testified that the Debtor came to Gauthier's business office and signed the second addendum in her presence.

The Debtor denied having any memory of this. While it is difficult to believe that the testimony of both witnesses could be true, it is possible that Deeter's memory is not reliable on some details because of her condition. Of note, it is undisputed that the Debtor's legal counsel, who was recommended by the Realtor, did not review any addendum, negotiate any addendum with Gauthier's counsel, or discuss any addendum with the Debtor. In fact, the attorney never met the Debtor in person and appears to have only discussed the terms of the purchase and sale agreement in a call with the Debtor. The attorney testified that he only became aware of the addenda after they had been signed. The Realtor testified that she did not review the addenda or purchase and sale agreement with the Debtor because that was the province of the attorney.

6

Gauthier paid all amounts necessary to cure the Debtor's arrears under her mortgage loan and then made all mortgage payments and real estate tax payments after curing the default until October of 2021. Ex. 20. After the Debtor became unresponsive and hostile to Gauthier, he commenced an action for specific performance on or about December 3, 2021 and obtained a *lis pendens* on the property several months later.

In the Fall of 2022, Attorney Scott S. Sinrich became involved representing the Debtor in the specific performance litigation and in disputing the agreements with Gauthier. Attorney Sinrich introduced the Debtor to Vincent DiLeo of EC&C. EC&C agreed to undertake renovations to make the Property habitable to allow the Debtor to move back to the Property. DiLeo testified that EC&C was a commercial contractor that did large projects and was in a very good financial position. He credibly testified that he was asked to assist the Debtor by Attorney Sinrich, his lawyer and friend, and agreed to try to do that. On or about September 23, 2022, EC&C and the Debtor entered into a Home Improvement Contract ("HIC") (Ex. 10), and the Debtor executed and delivered a mortgage (the "EC&C Mortgage") drafted by Attorney Sinrich (Ex. 11). I infer, since Attorney Sinrich represented the Debtor in the specific performance litigation, that he was aware of the *lis pendens* when he prepared and arranged to record the EC&C mortgage.

The terms of the HIC and EC&C Mortgage were unusual. The Debtor and DiLeo testified that, notwithstanding the payment terms of the HIC, EC&C would be paid when the Debtor was able and that the EC&C Mortgage would secure that payment. DiLeo testified that he had no financial need or intention to pressure the Debtor for payment. He credibly testified that not only did his company do renovations to the Property, but that he obtained furniture and appliances for the Debtor for her comfort and to make the Property habitable. He further

7

testified that he never reviewed the EC&C Mortgage and was not familiar with its terms. The EC&C Mortgage contained unusual terms that permitted subdivision and was not referenced in the HIC. DiLeo testified that he had no intention to attempt to develop the Property and that he was just trying to help. The Debtor testified that she paid EC&C the small up front payment required under the HIC, but could not identify any bank record reflecting that payment.

Gauthier argues that I should infer that the actions of EC&C were undertaken as a means to avoid the Gauthier agreements and secure a foothold for DiLeo to develop the Property—that the efforts by the Debtor and EC&C amounted to a "joint venture" to develop the Property. While both the Gauthier agreements and the HIC and EC&C Mortgage were unusual and could be viewed to take advantage of the Debtor, it is undisputed that each assisted the Debtor significantly. One thing is clear from the evidence and that is the Debtor became resolved to move back into the Property. She refused to cooperate with Gauthier, and when EC&C offered to assist, she took steps to take advantage of that offer to move back into her home.

The evidence is also clear that the Debtor was significantly motivated in filing her bankruptcy case to stay the specific performance litigation and to utilize § 365 to reject the agreement with Gauthier rather than litigate her defenses and "fraud" claims. She testified that she was motivated to file bankruptcy because of creditor pressure, but her testimony that the Gauthier litigation was not a consideration in the filing was not credible. From this record, I infer that the Debtor was motivated to retain her house and to avoid the sale of the Property for an amount that seems to be substantially less than its value, assuming the value alleged by the Debtor is correct. I accept the Debtor's testimony that she was desperate and, at times, impaired when she was dealing with Gauthier. I also credit her testimony that she understands that she owes EC&C money, but has no pressure to pay, and that she was not able to pay the principle

8

down on her credit card prior to filing bankruptcy. She also appears to have had a payment plan with the electric company because she had been unable to pay a large winter bill. While Gauthier contends that the Debtor's amendment of Schedule J to reduce her utility expenses amounted to a "litigation strategy" rather than a genuine effort to correct the record, based on the Debtor's testimony, I do not view the original disclosure as having been intended to mislead the Court or other creditors evidencing bad faith. She also testified that she was receiving calls from credit card companies in the period prior to her filing. While there was some evidence that the Debtor stopped making payments to creditors after meeting with a bankruptcy attorney, that is not unusual, and the Debtor testified to facts from which I inferred that she was not able to pay the full amount of her charges for some time. The Debtor testified that her monthly income was consumed by her living expenses at the time of her filing.

Klauer credibly testified that when the debtor moved into the apartment on Klauer's property, the Debtor suggested rent at $1,175 a month, which she accepted. Klauer testified that the Debtor stopped making rent payments when she resumed making mortgage payments for the Property. The Debtor testified that she has an obligation to bay back rent to Klauer. Klauer credibly testified that she has never made any demand for payment and that she allowed her friend to stay in an apartment on her property even after she stopped paying rent. I find that there is a debt owed for rental of the apartment even though it is unclear how far Klauer would go to collect the rent. The fact that Attorney Sinrich filed the proof of claim on behalf of Klauer does not diminish the claim in that I infer that Klauer was unlikely to take steps to pursue the claim herself and the Debtor desired to address the Klauer claim. I do recognize the strategic element to Attorney Sinrich's representation of Klauer in filing the proof of claim, while it is unclear why the Debtor did not file a surrogate claim.

I find that invoices were rendered for legal services by the Debtor's prior counsel that constitute a debt. Former counsel testified that it was not his practice to pursue collection of outstanding amounts from former clients, but that does not defeat the claim.

Gauthier has cited several of cases outside of this District that have found bad faith where parties with no financial pressure have filed bankruptcy to avoid performance under a sale agreement. *See, e.g.*, *Shell Oil Co. v Waldron (In re Waldron)*, 785 F.2d 936, 940 (11th Cir. 1986) (reversing bankruptcy court determination that stable, "trouble-free" debtors could invoke chapter 13 solely to reject an option contract and remanding so that petition could be dismissed; finding that "Congress could not have intended that the debt-free, financially secure [debtors] be permitted to engage the bankruptcy machinery solely to avoid an enforceable option contract"); *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1445 (9th Cir. 1986) (determining plan not filed in good faith in a case in which request to reject contract was denied in debtors' chapter 11 case and the debtors subsequently refiled a chapter 13 case, among other factors); *In re Safakish*, No. 18-50769 MEH, 2018 WL 5621783, at *7 (Bankr. N.D. Cal. Oct. 29, 2018) (dismissing the case under § 1307, among other things, as a bad faith filing where the sole purpose of the bankruptcy was to reject a settlement agreement the debtor believed had been repudiated to defeat state court litigation by gaining an advantage in bankruptcy court where there appeared to be no other need for chapter 13 case). These cases are instructive, even though they are not binding on this Court, but have an undercurrent of a stable debtor attempting to get out of a deal to enrich themselves. There is no evidence that the Debtor wants to do anything other than live in her house. She has no other home, and there is no evidence that her friend would allow her to occupy an apartment rent free for an unlimited time. While Gauthier contends that the Debtor was not under financial pressure, there was evidence of a threat that her

10

electric service would be terminated and that she was managing credit card balances. I infer that the Debtor was not financially stable and under pressure that she would lose her home. She was engaged in litigation over the Property and appears unable to pay the cost of that litigation. Taking into consideration the totality of her circumstances and weighing competing evidence, the preponderance of the evidence does not lead me to conclude that the Debtor filed her bankruptcy case in bad faith. The discrepancies on the schedules are concerning but, in the end, do not tip the scales enough to indicate that the Debtor filed the case in bad faith.

Accordingly, I find that Gauthier has not met his burden to demonstrate sufficient cause for dismissal under § 1307(c) and deny the Dismissal Motion. To be clear, I am not in any way ruling that finding a preponderance of evidence that the Debtor acted in good faith in filing her petition precludes consideration of whether the Debtor's plan is filed in good faith, a question that is not before me and I reserve on deciding that issue until confirmation is considered. While the circumstances of the Gauthier transaction are unusual, the evidence is clear that Gauthier relied on the agreement and the addenda when he paid amounts due to the mortgagee and Town of Millbury. It is unclear whether Gauthier could assert an equitable subrogation or constructive trust theory or some other means to collect amounts that he paid on behalf of the Debtor.[4] It is noteworthy that the latest plan filed by the Debtor does not seek to modify or otherwise address the EC&C mortgage, which appears to be due, other than referencing in the nonstandard plan provisions in Part 8 that the claim is not included in the plan and that EC&C will retain its

---

[4] The Court has granted an extension for Gauthier to file a proof of claim to a date that is thirty days after rejection, whether such rejection is effected by order granting a rejection motion or confirming a chapter 13 plan. *See* Ord. [ECF No. 66]. Just before the trial on the Dismissal Motion and Homestead Objection, the Debtor also filed a motion to reject Gauthier's contract to purchase the Debtor's Property [ECF No. 190] (the "Rejection Motion"), which motion was objected to by Gauthier [ECF No. 194]. The basis of the Gauthier's objection to rejection is the Debtor's bad faith in filing as described in the Dismissal Motion "precisely to bring the instant Motion to Reject the Purchase and Sale Agreement and its incorporated addenda, as an executory contract." Obj. [ECF No. 194] at 1. Accordingly, determination of the Dismissal Motion is necessary to determine the Rejection Motion and it has been effectively stayed for that purpose.

secured claim. *See Fourth Amended Chapter 13 Plan* [ECF No. 168] (the "Plan"). I will consider evidence at confirmation regarding the treatment of all creditors' claims to weigh the totality of circumstances to determine the Debtor's good faith with respect to which she will have the burden of proof.

**II. Homestead Objection**

The Massachusetts Homestead Act offers up to $500,000 protection from creditor seizures where a homeowner has recorded a declaration of homestead in accordance with the requirements of the statute. Mass. Gen. Laws ch. 188, § 3. Recording the declaration creates an "estate of homestead" for the benefit of each owner of the home and family members who occupy or intend to occupy the home as their principal residence. *Id.* In the absence of a valid declared homestead, the statute provides for an automatic homestead of $125,000 for the benefit of an owner and the owner's family members. Mass. Gen. Laws ch. 188, § 4. Section 1 of the Massachusetts Homestead Act defines "[d]eclared homestead exemption," in relevant part, without reference to certain additional ownership-based qualifications not applicable to this case, as being "created by a written declaration, executed and recorded pursuant to section 5." Mass. Gen. Laws ch. 188, § 1. Chapter 188, § 5(a) states in pertinent part:

> A declaration of homestead shall be in writing, signed and acknowledged under penalty of perjury by each owner to be benefitted by homestead . . . [and, among other requirements] (1) each owner to be benefited by the homestead, and the owner's non-titled spouse, if any, shall be identified; (2) the declaration shall state that each person named therein occupies or intends to occupy the home as their principal residence[.]

Mass. Gen. Laws ch. 188, § 5(a).

On her bankruptcy schedules, the Debtor claims an exemption in the Property of 100% of its fair market value up to $500,000 pursuant to Mass. Gen. Laws ch. 188, §§ 1 and 3. The Debtor values the Property at $448,000. The Trustee filed the Homestead Objection asserting

12

that the Debtor's Declaration of Homestead was ineffective to exempt the Debtor's interest in the Property because she did not occupy or intend to occupy the Property as her principal residence. Gauthier later joined the Homestead Objection. Notwithstanding the Stipulation between the Trustee and Debtor, the approval of which remains pending and has been objected to by Gauthier, the Trustee has not withdrawn the Homestead Objection and the Trustee has reported that nothing in the Stipulation or Plan is intended to prejudice Gauthier's rights to continue to contest the Debtor's homestead exemption, and Gauthier exclusively took up the mantle on the Homestead Objection at the trial.[5] *See Statement of Chapter 13 Trustee and Memorandum of Law* [ECF No. 198] (the "Statement").[6]

A claimed exemption is presumed to be valid unless a party in interest objects, *see* 11 U.S.C. § 522(*l*), and that objecting party has the burden to prove otherwise, *see* Fed. R. Bankr. P. 4003(c). "If the objector introduces evidence effectively challenging the exemption, the burden shifts to the debtor to produce evidence in support of [the debtor's] claim." *In re Genzler*, 426 B.R. 407, 418 (Bankr. D. Mass. 2010) (citations omitted). The burden of persuasion remains at

---

[5] The Trustee and the Debtor filed a stipulation and a motion to approve same, which required the filing of an amended plan and approval of which remains pending. Consistent with the Stipulation, the Debtor filed the Plan. The Stipulation and Plan encompass the conditions on which the Trustee has agreed to resolve the Homestead Objection. Specifically, the Debtor has agreed to seek confirmation of a chapter 13 plan that provides for 48 months of payments of her disposable income. In exchange, the Trustee will not contest the application of a $500,000 homestead exemption in such plan's liquidation analysis. If the Debtor decides to sell, pledge, or otherwise transfer an interest in the Property during the case, her homestead exemption will be "capped" at $125,000 and she will be required to pursue a sale process that is open to competing offers. If the Debtor withdraws the Plan, fails to confirm the Plan or another Plan that is consistent with the conditions set forth in the Stipulation, or files an amended plan on terms that differ from the Stipulation, the Trustee has reserved all rights. Gauthier filed an objection to confirmation of the Plan [ECF No. 181] and an objection to the motion to approve the Stipulation [ECF No. 182].

[6] The Trustee stated: "[i]n light of the Stipulation and Plan, the Trustee does not intend to examine witnesses, present evidence, or make argument with respect to the underlying issues presented by the Homestead Objection." Statement at ¶ 10. In asserting that approval of the Stipulation would be appropriate, the Trustee also notes that "[p]revailing on the Homestead Objection would require the Trustee to prove that the Debtor does not intend to occupy the Property for the foreseeable future. This inquiry into the 'heart and mind' of the Debtor is a question of fact for which there is no direct evidence. The Trustee has visited the Property, propounded discovery upon the Debtor, and participated in a deposition of a third-party. Only after this investigation into the Debtor's claims did the Trustee negotiate the resolution of his objection." *Id*. at ¶ 15.

13

all times with the objecting party. *See, e.g.*, *In re Kology*, 499 B.R. 20, 35 (Bankr. D. Mass. 2013) ("[i]f the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper. [T]he burden of persuasion, however, always remains with the objecting party" (quoting *Carter v. Anderson (In re Carter)*, 182 F.3d 1027, 1029 n.3 (9th Cir. 1999))).

The parties agree that Deeter was the record owner of the Property and properly recorded a Declaration of Homestead with the Worcester County Registry of Deeds on December 5, 2022. They disagree on whether Deeter occupied or intended to occupy the Property as her principal residence as of that date. They also disagree as to the standard of review applicable to a homestead objection and submitted post-trial briefing on the subject. *See Memorandum of Law in Support of Objection to Debtor's Claim of Homestead Exemption* [ECF No. 230] ("Gauthier Post-trial Br."); *Debtor's Brief Regarding Evidentiary Standard Applicable to Objection to Homestead* [ECF No. 231] ("Debtor Post-trial Br."). The Debtor argues that because Mass. Gen. Laws ch. 188, § 5(d) provides that a "statement of principal residence… shall be binding upon and identified owner,…, But may be overcome by and interested third-party upon presentation of clear and convincing evidence to the contrary[,]" that this more stringent standard should apply to challenge a homestead exemption in bankruptcy in view of the importance of preserving homestead rights. Gauthier argues that Mass. Gen. Laws ch. 188, § 5(d) is merely a "procedural" provision that is preempted as a matter of federal supremacy by the Federal Rules of Bankruptcy Procedure and federal common law requiring only preponderance of the evidence to overcome a homestead exemption claim.

14

I am mindful both that the homestead exemption is to be liberally construed in favor of a debtor, *see, e.g.*, *Shamban v. Perry (In re Perry)*, 357 B.R. 175, 178 (B.A.P. 1st Cir. 2006) (citations omitted), and the admonitions of the United States Court of Appeals for the First Circuit regarding preemption of the Mass. Gen. Laws ch. 188, § 5 exception for preexisting debts by the Bankruptcy Code's lien avoidance provision, *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 681, 683 (1st Cir. 1999).[7] However, as Gauthier has not met his burden to demonstrate that the Debtor was not entitled to claim a homestead exemption under the preponderance of the evidence standard, it is not necessary to reach the question of whether federal law preempts application of the more stringent clear and convincing standard.

I find that the Debtor had the intention to occupy the Property as her principal residence on the date that she filed her Declaration of Homestead with the Worcester County Registry of Deeds on December 5, 2022, and that she moved back into the Property as her permanent residence shortly after that date when repairs were completed that made the Property habitable. While prior to that date, the Debtor had listed the property for sale, moved from the Property for long periods of time when the Property was not habitable, and participated in a sale process with Gauthier, I found her to be credible in testifying regarding her intentions as of December 2022 to occupy the Property as her principal residence and that her intervening conduct supports her testimony regarding her intent and explanation as to why any previous absence was not intended

---

[7] As observed in *In re Betz*:

> Weinstein, therefore, carves out two distinct and separate spheres within which federal and state laws operate under the Bankruptcy Code. Congress has delegated a limited subset of the federal sphere of power in allowing states to define the nature and amount of exemptions. Federal law trumps state law where it conflicts with policies of the federal law or where state law steps outside the delineated limits of the allotted subset of state law. This approach comports with the fact that "Congress has plenary power to enact uniform federal bankruptcy laws."

273 B.R. 313, 324 (Bankr. D. Mass. 2002).

to be permanent. She was questioned regarding her right to occupy as a prior use of the Property after zoning changes, but her responses did not diminish my finding of her actual intent as of when she declared the homestead. Her conduct manifested a clear intent that she believed she was not prohibited by the zoning changes from occupying the Property as her principal residence. I find that she believed that she could move back to the home in which she lived most of her life; she did occupy the Property shortly after filing the declaration of Homestead; and that as of the trial she resided at the Property and had for almost one year at that time. While Deeter was less credible in testifying about the circumstances of her agreements with Gauthier, I find that those circumstances would have been confusing to a person affected by advanced age, self-characterized alcoholism, desperation, lack of actual professional guidance, and an unconventional sale process. While her intent to occupy the property after signing agreements with Gauthier may have had the risk of dispossession, her intent remained clear.

Gauthier did not meet his burden to demonstrate that Deeter did not intend to occupy the Property at the time she filed the Declaration of Homestead under a preponderance of the evidence standard.

**III. Conclusion**

Based on the foregoing, the Court denies the Dismissal Motion and overrules the Homestead Objection.

Dated: September 30, 2024　　　　　　　　　By the Court,

　　　　　　　　　　　　　　　　　　　　　_{signature}_
　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Christopher J. Panos
　　　　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge